1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,          No.  1:19-cr-00244-ADA-BAM

12              Plaintiff,

13       v.                             ORDER DENYING DEFENDANT'S
                                        MOTION TO DISMISS THE INDICTMENT
14   BRYAN BARTUCCI,
                                        (ECF No. 94)
15              Defendant.

16

17          This matter is before the Court on Defendant Bryan Bartucci's (Defendant) motion to

18   dismiss the Indictment pursuant to Rule 12 of the Federal Rules of Criminal Procedure.  (ECF No.

19   94.)  A motion hearing was conducted on January 18, 2023, before the undersigned on which the

20   Court took the motion under submission.  (ECF No 101.)  For the reasons stated below, the Court

21   will deny Defendant's motion to dismiss the Indictment.

22                                    **I.**

23                       **Factual and Procedural Background**

24          On December 18, 2018, the United States charged the Defendant via Information[1] with a

25   violation of 18 U.S.C. § 922(a)(1)(A), engaging in the business of dealing firearms without a license

26   (18-cr-00270-ADA-BAM).  (ECF No. 1 at ¶ 10.)  On December 19, 2018, Defendant was arraigned

27   _____

28   [1]  Defendant waived his right to be indicted by a grand jury and agreed instead to be prosecuted by
     Information.  (*See* Case No. 18-cr-00270-ADA-BAM, ECF Nos. 1 and 4.)

                                        1

on the Information and was advised of the maximum penalties for the offense including a term of imprisonment greater than one year.  (*Id*. at ¶ 11.)  On January 24, 2019, the parties entered into a deferred prosecution agreement (Agreement) whereby, the United States would dismiss Defendant's charges if he satisfied his obligations under the Agreement for a period of 18 months.  (*See* Case No. 18-cr-00270-ADA-BAM, ECF No. 8 at 3.)

According to the Indictment, approximately six months after entering the Agreement, Defendant purchased two firearms— a Smith & Wesson, model 5906, 9mm caliber pistol, bearing the serial number VYZ1340 and a Savage, model 730, 12-gauge shotgun, bearing the serial number 80955—picking them up on July 6, 2019.  (ECF No. 1 at ¶ 8.)  During that transaction, Defendant represented on the ATF Form 4473 that he was not subject to an Indictment or Information on felony charges punishable by imprisonment greater than one year.  (*Id*.)  On September 18, 2019, Defendant purchased another firearm—a CZ, model CZ75 Compact, 9mm caliber pistol, bearing the serial number CS65806—and in doing so made the same representation on the ATF Form 4473 as in the earlier transaction.  (*Id*. at ¶ 20.)  The Defendant did not receive this firearm.  (*Id*.)

On October 24, 2019, the United States filed a criminal complaint charging Defendant with one count of 18 U.S.C. § 922(n), illegal receipt of a firearm by a person under indictment or information, and two counts of 18 U.S.C. § 924(a)(1)(A), making a false statement during purchase of a firearm.  (ECF No. 1.)  On November 14, 2019, a grand jury returned an Indictment officially charging Defendant with one count of illegal receipt of a firearm by a person charged by felony information on July 6, 2019, in violation of 18 U.S.C. § 922(n), and with two counts of making a false statement during the purchase of a firearm on June 5, 2019, and on September 18, 2019, in violation of 18 U.S.C. § 924(a)(1)(A).  (ECF No. 11.)  On July 27, 2022, the Court issued an order granting the parties' stipulated request to set a change of plea proceeding for August 29, 2022.  (ECF No. 87.)  On August 28, 2022, the parties vacated the change of plea proceeding, and a trial was set for November 15, 2022.  (ECF No. 91.)  On October 4, 2022, the parties vacated the trial, and on November 2, 2022, Defendant filed this motion to dismiss the Indictment and a motion hearing was set.  (ECF Nos. 93 and 94.)  On December 9, 2022, the United States filed its opposition to the motion, and on December 23, 2022, Defendant filed his reply.  (ECF Nos. 98, 100.)  The

1   motion hearing took place on January 18, 2023, before the undersigned and the Court took the

2   motion under submission.  (ECF No. 101.)

3       On this pending motion, Defendant moves to dismiss Count 1 of the Indictment which

4   charges him with receipt of a firearm in violation of 18 U.S.C. § 922(n) arguing that the framework

5   under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) renders this statute

6   unconstitutional under the Second Amendment.  (*See* ECF Nos. 94 and 100.)   Additionally,

7   Defendant alleges that Counts 2 and 3 of the Indictment which charge him with violation of 18

8   U.S.C. § 924 (a)(1)(A) must be dismissed because Defendant, as a matter of law, did not knowingly

9   make any false statements or representations with respect to information required to be kept in the

10  records of a federally licensed firearms dealer.  (*See* ECF No. 100.)  The United States disagrees

11  with Defendant's reading and application of *Bruen's* holding.  (*See* ECF No. 98.)

## II.

### Legal Standard

14      The Second Amendment "guarantees the individual right to possess and carry weapons in

15  case of confrontation."  *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  At the core of

16  this guarantee sits the right to keep and bear handguns for the purpose of self-defense both inside

17  and outside the home.  *Id.* at 630; *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.

18  2111, 2122 (2022).  When the Supreme Court issued its seminal Second Amendment opinion in

19  *District of Columbia v. Heller*, it held that Second Amendment rights could not be subject to interest

20  balancing.  *Id.* at 634.   Though the Court did not articulate a formal test to determine the

21  constitutionality of firearm regulations, it did hold that the modern scope of Second Amendment

22  rights is equivalent to their scope at the time of the amendment's adoption.  *Id.* at 634–35.  In the

23  absence of more direction from *Heller*, the Courts of Appeals subsequently articulated a two-part

24  test, combining the use of history and means-end scrutiny, by which to assess the constitutionality

25  of firearm regulations.  *See Bruen*, 142 S. Ct. at 2125.  The first step of the test required the

26  government to demonstrate that it sought to regulate activity outside the scope of the original

27  understanding of the Second Amendment.  *Id.* at 2126.  If the historical evidence for the regulation

28  was inconclusive or suggested that the Second Amendment protected the regulated activity to some

degree, courts would then analyze the law under either strict or intermediate scrutiny, depending on the regulation's proximity to the core of the Second Amendment.  *Id.*

In *Bruen*, the Court jettisoned the second step of this test, holding that courts must analyze the Second Amendment's scope through the lens of history and tradition without regard to means-end scrutiny.  *Id.* at 2128.  The Court then articulated the proper mode of analysis to assess the constitutionality of laws burdening Second Amendment rights as follows:

1.      Does the plain text of the Second Amendment cover the regulated conduct?

2.      If so, then the Constitution presumptively protects the conduct, requiring the government to justify the law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

*Id.* at 2126.  The Court emphasized that rather than introducing a novel method of analysis, it simply reoriented courts to the methodological approach in *Heller* and *McDonald*, which rejected the use of means-end scrutiny as a tool for assessing the scope of the Second Amendment.  *Id.* at 2128–29.

While both *Heller* and *Bruen* expanded individual rights, the Court has repeatedly emphasized that the Second Amendment's reach is not unlimited.  *See Heller*, 554 U.S. at 595; *McDonald v. Chicago*, 561 U.S. 742, 786; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). *Heller* articulated certain restrictions as "presumptively lawful," *id.* at 627 n.26, including "prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27.  It also noted a long American tradition of prohibiting the carrying of concealed weapons.  *Id.* at 626.  The majority opinion in *Bruen* is coy about the continuing validity of these prohibitions, noting the *Heller* Court explicitly refrained from undertaking "an exhaustive historical analysis" of them.  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).  Nevertheless, Justices Kavanaugh and Roberts, concurring with the *Bruen* majority, reiterated what they perceived as the continuing validity of *Heller*'s presumptively lawful prohibitions.  *Id.* at 2162 (Kavanaugh, J., concurring).

///

///

4

### III.

### Discussion

In this pending motion to dismiss the Indictment, the parties dispute whether under the newly announced *Bruen* framework 18 U.S.C. § 922(n) violates the Second Amendment to the United States Constitution.  (*See* ECF Nos. 94, 98, and 100.)  Following the *Bruen* decision and looking at other district court decisions concerning the constitutionality of Section 922(n), the Court will first analyze whether under *Bruen*, Count 1 of the Indictment, *to wit* whether a violation of 18 U.S.C. § 922(n), which prohibits any person under felony indictment or information from receiving a firearm, violates the Defendant's Second Amendment rights because his regulated conduct (receipt of a firearm) falls within the type of conduct the Second Amendment protects.  Then, the Court will analyze whether the government failed to prove that 18 U.S.C. § 922(n)'s prohibition on the receipt of firearms for those under felony indictment or information is consistent with the Nation's historical tradition of firearm regulation.

Lastly, the Court will determine whether Counts 2 and 3 of the Indictment, violations of 18 U.S.C. § 924(a)(1)(A), which prohibit making false statements during the purchase of a firearm, must be dismissed because the Defendant, as a matter of law, did not knowingly make any false statements or representations with respect to information required to be kept in the records of a federally licensed firearms dealer.

However, the Court will first address a threshold issue the Government raised suggesting that Defendant's challenge to Section 922(n) should be analyzed through a due process lens—thus, making *United States v. Salerno*, 481 U.S. 739 (1987) govern this issue rather than under *Bruen*. (*See* ECF No. 98.)

For the reasons stated below, the proper framework to analyze the issues brought forth by this case is under *Bruen* not *Salerno*; 18 U.S.C. § 922(n) does not violate Defendant's Second Amendment rights; and subsequently, counts 2 and 3 violations of 18 U.S.C. § 924(a)(1)(A) will not be dismissed.

///

///

5

**A. The proper framework to analyze Defendant's challenges to Section 922(n) is under *Bruen* and not under *Salerno*.**

In opposition, the Government alleges that the relevant question in Defendant's challenge to the constitutionality of Section 922(n) is not whether a person who commits a serious crime can be prohibited from receiving, shipping, or transporting a firearm—he can[2]—but whether that restriction can be imposed upon indictment or only upon conviction. (*See* ECF No. 98 at 4.) The Government argues that because Section 922(n) applies to pretrial arrestees, the proper analytical framework comes from *Salerno* which held that criminal defendants "may face substantial liberty restrictions as a result of the operation of our criminal justice system." (*Id.*); *See also Salerno*, 481 U.S. at 749. The *Salerno* Court upheld the 1984 Bail Reform Act's provisions for pretrial detention of arrestees found to pose danger to the safety of the community over a Fifth Amendment due process challenge. *Salerno*, 481 U.S. 739.

The Government argues that because the needs of our criminal justice system have justified restrictions on criminal defendant's Fourth, Fifth, and Sixth Amendment rights, then they can also justify "the restriction of putative Second Amendment rights at issue here." (ECF No. 98 at 5) (citations omitted). The Government thus posits the means-end balancing analysis used in *Salerno* as the right framework to analyze Defendant's challenge. (*Id.* at 6.) This argument does not persuade the Court. First, *Bruen* clearly rejected, for Second Amendment challenges, the means-end balancing analysis. *Bruen*, 142 S. Ct. at 2127 (rejecting the means-end balancing step in the two-prong analysis the Courts of Appeals created because *Heller* and *McDonald* do not support applying means-end scrutiny in a Second Amendment context). Second, Defendant has not raised a due process challenge to Section 922(n), nor has he raised any challenge to a condition of his pretrial release. (*See* ECF Nos. 94 and 100.) Instead, Defendant challenges the constitutionality of Section 922(n) under the *Bruen* framework. As such, this Court will analyze Defendant's challenges to Section 922(n) under *Bruen*.

---

[2] The Government lists many cases pre- and post-*Bruen* that have consistently held that prohibitions of possession, receipt, transport, and shipment of firearms for those convicted of a felony are constitutional (Section 922(g)(1)). (*See* ECF No. 98 at 4.)

1        **B.  The Second Amendment analysis under *Bruen*.**

2            *Bruen* requires lower courts to apply a textual and historical review of the Second

3    Amendment at the time it was enacted in reaching their decisions, that is, it requires judges to find

4    historical analogies in existence in the 17th and 18th centuries to modern gun law regulations.

5    *Bruen*, 142 S. Ct. 2111.  If any historical analogies are found, then the modern gun law regulation

6    at issue will pass constitutional muster.  *Id.*  If no historical analogies are found, then the modern

7    gun law regulation violates the Second Amendment.  However, the unique test the Supreme Court

8    announced in *Bruen* does not provide lower courts with clear guidance as to how analogous modern

9    laws must be to founding-era gun laws.  In the short time post-*Bruen*, this has caused disarray

10   among the lower courts when applying the new framework.  Accordingly, this Court will look at

11   those decisions as instructive in this Court's analysis.

12           In the wake of *Bruen*, the following district courts have held Section 922(n) as

13   unconstitutional after applying the *Bruen* framework.  *See United States v. Quiroz*, No. PE:22-CR-

14   00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (finding Section 922(n) invalid because

15   the statute is inconsistent with the Nation's historical tradition of firearm regulation); *United States

16   v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)

17   (same), *reconsideration denied,* No. CR-22-00218-PRW-2, 2023 WL 172037 (W.D. Okla. Jan. 12,

18   2023); *United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 WL 164170 (W.D. Tex. Jan. 9,

19   2023) (relying in *Quiroz*, found Section 922(n) invalid), *appeal docketed*, No. 23-50030 (Jan. 12,

20   2023); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509 (N.D. Ind. Oct.

21   31, 2022) (same), *appeal docketed*, No. 22-3160 (Dec. 1, 2022).  In contrast, three district courts

22   have found Section 922(n) constitutional, and the Fifth Circuit has recognized the statute as valid

23   applying plain error analysis.  *See United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519,

24   (W.D. Okla. Aug. 29, 2022) (found Section 922(n) consistent with the Nation's historical tradition

25   of firearm regulation); *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578 (M.D.

26   Tenn. Nov. 16, 2022) (same); *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037

27   (S.D.N.Y. Jan. 26, 2023) (same); *United States v. Avila*, No. 22-50088, 2022 WL 17832287 (5th

28   Cir. Dec. 21, 2022) (applying plain error review because defendant had not brought a Second

7

1  Amendment challenge below, found Section 922(n) constitutional).

2        **1.  The Second Amendment plain text covers Defendant's conduct of receipt of a**

3                **firearm.**

4        The first step in the *Bruen* analysis is to determine whether the "Second Amendment's plain

5  text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30.  The Second Amendment states

6  that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people

7  to keep and bear Arms, shall not be infringed."  U.S. Const., amend. II.  In determining whether

8  the Seconds Amendment protects the conduct at issue, the Supreme Court instructs that the analysis

9  should be based on the "operative clause— 'the right of the people to keep and bear Arms shall not

10  be infringed.'"  *Bruen*, 142 S. Ct. at 2127, 2134 (quoting *Heller*, 554 U.S. 627).  In defining the

11  meaning of this clause, the Court noted that "the right" refers to codifying a "pre-existing right"

12  and that the weapons at issue must be "[a]rms," which means weapons "in common use" today for

13  self-defense.  *Id*.  The Court also noted that the Second Amendment protects the rights of "ordinary,

14  law-abiding citizen[s] to possess a handgun in the home for self-defense."  *Id*. at 2122.

15        Defendant argues that he is undisputedly part of "the people" whom the Second Amendment

16  protects because *Heller* noted that there is a "strong presumption that the Second Amendment right

17  is exercised individually and belongs to all Americans."  (*See* ECF No. 94 at 5) (quoting *Heller*,

18  554 U.S. at 580).  Defendant also alleges that "[h]aving never suffered a prior felony conviction,

19  for purposes of the Second Amendment, [he] is 'an ordinary, law-abiding, adult citizen' that the

20  Second Amendment was intended to cover."  (*Id*.) (quoting *Bruen*, 142 S. Ct. at 2134).

21  Additionally, Defendant argues that his alleged conduct—the receipt of firearms—is "plainly

22  covered by the Second Amendment" and since the two firearms that Defendant "is alleged" to have

23  received are both "weapons in common use today for self-defense," the Constitution presumptively

24  protects the conduct.  (*Id*. at 5-6) (quotations omitted).

25        The Government, on the other hand, argues that Defendant, as a felony indictee, falls within

26  the class of individuals who the Supreme Court has determined retain no Second Amendment

27  rights.  (*See* ECF No. 98 at 8.)  The Government does not dispute whether the firearms Defendant

28  received are "weapons in common use today for self-defense," nor whether the "receipt" of a

1   firearm is within the plain text of the Second Amendment.  (*Id*.)  Rather, the Government argues

2   that since Defendant has been charged with a felony offense, and is "accordingly not a law-abiding,

3   responsible citizen within the meaning of *Heller*, *Bruen*, and the Second Amendment," his conduct

4   is not covered by the Second Amendment's plain text.  (*Id*. at 12.)

5        The Government posits that Defendant's status as a felony indictee should be considered

6   along with the conduct at issue—receipt of a firearm.  However, in *Bruen*, the Supreme Court only

7   considered the *conduct* of the individuals challenging the law, which was to carry firearms outside

8   the home, something that the New York statute at issue prohibited.  *See Bruen*, 142 S. Ct. 1117

9   (emphasis added); *See also Rowson*, 2023 WL 431037, at *15 (noting that the Court's focus in

10  *Bruen* was not on potentially disqualifying status characteristics of the individuals challenging the

11  statute but rather on the "conduct" the statute proscribed); *Quiroz*, 2022 WL 4352482, at *3 (noting

12  that an individual's conduct, not status, is what needs to be analyzed to determine if it is protected

13  by the plain text of the Second Amendment).

14       Also, none of the post-*Bruen* decisions that have analyzed the constitutionality of Section

15  922(n) have followed what the Government proposes.  *See Kay*, 2022 WL 3718519, at *2 (stating

16  that the first prong under *Bruen* requires courts to analyze "an individual's conduct, rather than

17  status, to determine if it is protected by the plain text of the Second Amendment"); *Hicks*, 2023 WL

18  164170, at* 4 (analyzed the conduct proscribed by the statute and found that the conduct at issue

19  of receiving a firearm is encompassed by "to keep and bear arms" text of the Second Amendment);

20  *Holden*, 2022 WL 17103509, at *3 (same).  In fact, some of these courts have refused to analyze

21  an individual's status in the first prong of the *Bruen* analysis.  *See Kay*, 2022 WL 3718519, at* 2,

22  n.4 ("[T]he Court reiterates that an individual's Second Amendment rights are not predicated on

23  their classification, but rather their conduct"); *Quiroz*, 2022 WL 4352482, at *3 (noting that

24  prohibited conduct under Section 922(n) is "receipt" of a firearm and nothing more); *Rowson*, 2023

25  WL 431037, at *19 (noting that *Bruen*'s focus was on an individual's conduct rather than status

26  and the court will join other post-*Bruen* courts that have decided the same).

27       Further, even the two pre-*Bruen* courts that addressed the same question—whether felony

28  indictees charged with violation of Section 922(n) lost their Second Amendment rights—rejected

9

1   that proposition.  *See United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011) ("[A]

2   defendant under indictment is a 'law-abiding citizen' who remains eligible for Second Amendment

3   protections"); *United States v. Love*, No. 20-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3,

4   2021) ("The purchase of a firearm by a presumably innocent individual falls within the Second

5   Amendment right as historically understood").

6         This Court recognizes that there are competing ways of determining what groups of people

7   fall within the Second Amendment's scope of protections.  One approach is the "civic virtue" theory

8   which states that "there are certain groups of people—for example, violent felons—who fall

9   entirely outside the Second Amendment's scope," *Kanter v. Barr*, 919 F.3d 437, 451 (7th Circ.

10  2019) (Barrett, J., Dissenting), abrogated by *Bruen,*142 S. Ct. 2111 (internal citations omitted).

11  This approach requires courts to determine "who counts among 'the people' entitled to keep and

12  bear arms."  *Id*.  The other approach "maintains that all people have the right to keep and bear arms

13  but that history and tradition supports Congress' power to strip certain groups of that right."  *Id*. at

14  452 (internal citations omitted).

15        Such disagreement was in existence before *Bruen* and now post-*Bruen* is more alive than

16  ever.  *See United States v. Black*, No. CR 22-133-01, 2023 WL 122920, at *3 (W.D. La. Jan. 6,

17  2023) (collecting cases); *see also United States of America v. Vanessa Posey*, No. 2:22-CR-83 JD,

18  2023 WL 1869095 (N.D. Ind. Feb. 9, 2023) (explaining the tension between three Seventh Circuit's

19  decisions in defining "the people" for purposes of the Second Amendment).  The Ninth Circuit also

20  observed, without deciding, this split among the courts.  In *United States v. Vongxay*, 594 F.3d

21  1111 (9th Circ. 2010), the court noted that "most scholars of the Second Amendment agree that the

22  right to bear arms was 'inextricably … tied to' the concept of a 'virtuous citizen[ry]' that would

23  protect society through 'defensive use of arms against criminals, oppressive officials, and foreign

24  enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous

25  citizens (i.e. criminals). . ..'" (internal citations omitted).  The court, however, recognized that this

26  "historical question has not been definitively resolved."  *Id*. at 1118 (internal citations omitted).

27        This Court believes that applying either theory would yield the same result.  For example,

28  under the "civic virtue" approach, Defendant, as a felony indictee, is presumed innocent until

10

proven guilty and is therefore, assumed a "law-abiding citizen" that falls within "the people" the Second Amendment protects.  *See Laurent*, 861 at 102; *Stambaugh*, 2022 WL 16936043, at *2. Likewise, if the Court were to apply the other approach that maintains that all people have the right to keep and bear arms, the Second Amendment protects Defendant as well as part of "the people."

Furthermore, Defendant's conduct—receiving a firearm—is covered by the plain text of the Second Amendment.  *See Rowson*, 2023 WL 431037 (noting that the conduct which Section 922(n) addresses—receiving a firearm—is presumptively protected by the Second Amendment); *Holden*, 2022 WL 17103509 (same); *Kelly*, 2022 WL 17336578 (same); *Hicks*, 2023 WL 164170 (same); *Quiroz*, 2022 WL7352482 (same); *Kay*, 2022 WL 3718519 (same).

Applying *Bruen*'s two-prong test, since the "Second Amendment's plain text covers [Defendant's] conduct" the burden is now upon the Government to show that Section 922(n) is consistent with the Nation's historical traditions of firearm regulation.  *Bruen*, 142 S. Ct. at 2129-30.

### 2.  18 U.S.C. § 922(n) is consistent with the Nation's historical traditions of firearm regulations.

Under the *Bruen* framework, if the plain text of the Second Amendment protects the conduct being regulated, the government bears the burden to show that the prohibition at issue is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  This inquiry will be straightforward in some cases while in others it "will often involve reasoning by analogy." *Id.* at 2131.  The Supreme Court explained that the inquiry for analogies is not intended to impose a "regulatory straitjacket," but rather, it "requires only that the government identify a well-established and representative *historical analogue, not a historical twin*." *Id.* at 2133 (emphasis added).  In determining whether the regulation at issue and the historical regulation are "relevantly similar" courts should consider "at least two metrics: how and why the regulation burden a law-abiding citizen's right to armed self-defense." *Id*.

*Bruen* noted that when it comes to interpreting the Constitution, "not all history is created equal" and since the constitutional rights "are enshrined with the scope they were understood to have when the people adopted them," the best way to do the historical analysis is by understanding

the scope the Second Amendment had when it was adopted in 1791 and to look to 1868 when the Fourteenth Amendment was adopted as potentially confirmative evidence. *Id.* at 2136. *Bruen* also found that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

Following the *Bruen* framework, this Court was unable to find a replica of Section 922(n) during the founding era nor did the Government present any in its opposition. (*See* ECF No. 98.) As such, the Court will have to analyze by analogy. The Government points to two strains of historical firearm regulations that this Court believes are analogous with the restrictions imposed by Section 922(n): colonial tradition of disarming those groups of persons perceived as dangerous and surety laws. (*Id.*) The Court discusses those analogies below.

### a. Colonial laws disarming groups of persons perceived as dangerous.

History holds a long tradition, before and at the time of the Nation's founding, of disarming groups of persons perceived as dangerous or disfavored. For example, officers of the Crown would "seize all arms in the custody or possession of any person" seen as "dangerous to the Peace of the Kingdom." (*See* ECF No. 98 at 12) (citing Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)); *Rowson*, 2023 WL 431037, at *21 ("arms so seized may be restored to the owners again if the said Lieutenants or . . . their deputies or any two or more of them shall so think fit") (citations omitted).

Certain classes of people could be disarmed because they were deemed to be dangerous including those unwilling to take an oath of allegiance (to the crown and later the states), slaves, and Native Americans. (*See* ECF No. 98 at 13) (citing Robert H. Churchill, *Gun Regulations, the Police Power, and the Right to Keep Arms in Ealy America; The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); *See also Rowson*, 2023 WL 431037, at *21 ("There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as per se dangerous, on the basis of their religious, racial, and political identities")[3]

---

[3] In *Rowson*, the court canvassed examples of colonial and revolutionary era laws that disarmed groups of people perceived as dangerous based on their religious, racial, and political identities. *Rowson*, 2023 WL 431037, at *21. *See e.g.*, Adam Winkler, Gunfight: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 115-16 & accompanying notes (2013) (citing laws barring gun sales to Native Americans, due to fears of violence; free and enslaved Black or mixed-race persons, even where completely law-abiding, out of fear of revolution against white masters; and Catholics or Loyalists); Robert J. Spitzer, *Gun Law*

1   (internal citations omitted).

2          These classifications, especially those based on race or religion, are appalling and

3   doubtlessly, "would be unconstitutional today."  *See Drummond v. Robinson Twp.*, 9 F.4th 217,

4   228 n.8 (3d Cir. 2021).   Nevertheless, following the *Bruen* requirement for locating a historical

5   analogy, these regulations when viewed in combination, are telling about what was understood as

6   the scope of the Second Amendment during the period leading up to 1791.  *See Bruen*, 142 S. Ct.

7   at 2137.  Viewed as a whole, these laws permitted certain categories of persons from being disarmed

8   based on their perceived dangerousness or lack of status.  During this time, "[w]hile public safety

9   was a concern, most disarmament efforts were meant to prevent armed rebellions.  The early

10  Americans adopted much of that tradition in the colonies." *United States v. Rahimi*, No. 21-11001,

11  2023 WL 1459240, at*7 (5th Cir. Feb. 2, 2023) (citations omitted).

12         The Fifth Circuit Court of Appeals in comparing these historical disarmament regulations

13  to 18 U.S.C. § 922(g)(8)—which prohibits possession of a firearm while under domestic violence

14  restraining order—noted that the historical "dangerousness" laws are distinguishable to Section

15  922(g)(8) because the historical disarmament laws "disarmed people by class or group, not after

16  individualized findings of 'credible threats' to identified potential victims." *Id*. at *8.

17         Similarly, Section 922(n) imposes a partial limit on the Second Amendment rights of a

18  groups of persons that share an objective characteristic that is a fair proxy to dangerousness: an

19  indictment for a felony punishable by imprisonment for a term exceeding one year.  *See Medina v.*

20  *Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (noting that a felony is "the most serious category of

21  crime deemed by the legislature to reflect grave misjudgment and maladjustment") (citations

22  omitted).

23         In this historical backdrop, the historical dangerousness laws as well as Section 922(n),

24  _____

25  *History in the United States and Second Amendment Rights*, 80 L. & CONTEMPORARY PROBS. 55, 72
    & nn.103-04 (2017) (citing examples of colonial and revolutionary era laws disarming those who expressed
    dangerous opinions or refused to swear loyalty to the new American government); *see also* Samuel Cornell,

26  *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506-
    07 (2004) (citing examples of laws disarming those who refused to swear loyalty oaths) ("The security of

27  the community outweighed any right a person might have to possess a firearm."); *see also Waters v. State*,
    1 Gill 302, 309 (Md. 1843) (stating that, because free Black persons were treated as a "dangerous

28  population," "laws have been passed to . . . make it unlawful for them to bear arms").

1    cover only a subset of persons that were (are) perceived as more likely to commit crimes and not

2    the public at large.  *Salerno*, 481 U.S. at 750 (internal citations omitted) (noting that Congress has

3    found that felony indictees covered by the Bail Reform Act are "far more likely to be responsible

4    for dangerous acts in the community after arrest").  It can also be said that the burden imposed by

5    Section 922(n) is less than the historical dangerousness laws because Section 922(n) only prohibits

6    an individual under indictment from shipping, transporting, or receiving a firearm for a temporary

7    period; it does not prohibit possession of a firearm.

8          Accordingly, this Court finds that these colonial and revolutionary-era laws that disarmed

9    groups of people perceived as per se dangerous are "sufficiently relevant" analogies to Section

10    922(n).

11              **b.  Surety laws.**

12          Surety laws provide an additional historical analogy to Section 922(n).  The surety laws

13    codified the common-law surety system by restricting access to firearms to those accused of

14    wrongdoing.  The Government notes that these laws required individuals deemed likely to breach

15    the peace in the future to give surety or post a bond before publicly carrying a firearm.  (*See* ECF

16    No. 98 at 14.)  The surety required "was intended merely for prevention, without any crime actually

17    committed by the party; but arising only from probable suspicion, that some crime [wa]s intended

18    or likely to happen."  *Rahimi*, 2023 WL 1459240, at *9 (citing 4 WILLIAM BLACKSTONE,

19    COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769) at 249).  If the accused party was

20    unable to post surety or to show a special need for a firearm, he would be forbidden from carrying

21    a weapon in public.  *See Bruen*, 142 S. Ct. at 2148-49 (discussing surety laws).

22          These surety laws "derived from a longstanding English tradition of authorizing

23    government agents to seize arms from persons who had acted unlawfully or in a manner that

24    threatened the public."  *Rowson*, 2023 WL 431037, at *22 (collecting English laws); (*See also* ECF

25    No. 98 at 14) (citing other colonial-era examples).  Many jurisdictions codified this common law

26    tradition either before ratification of the Bill of Rights or in early decades thereafter.  *Rahimi*, 2023

27    WL 1459240, at *9 (citations omitted).  For example, in 1759, New Hampshire enacted a statute

28    empowering justices of the peace to arrest "all affrayers, rioters, disturbers or breakers of the peace,

or any other who shall go armed offensively, or put his Majesty's subjects in fear," and "upon view of such justice," "cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." *Rowson*, 2023 WL 431037, at *22 (citing Acts and Laws of His Majesty's Province of New-Hampshire in New-England 1-2 (1759)) (citations to other similar laws omitted).  These laws only required reasonable suspicion from officers of the peace, not a conviction, to justify confiscation of firearms; only the "view of such justice" was required.

The Supreme Court in *Bruen* also noted other late-18th century and early-19th century statutes that were adopted which "prohibited bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145.  Virginia adopted one such statute in 1786 which provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country."  *Id.* at 2144 (citing Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794) (internal quotations and footnotes omitted).  Likewise, a Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." *Id.* (citing 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts).  Lastly, an 1801 Tennessee statute required any person who would "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person to post a surety."  *Id.* at 2144-45 (citing 1801 Tenn. Laws 710, § 6) (internal quotations omitted).

However, the *Bruen* Court found the surety laws insufficient as a historical analogy for the New York proper-cause requirement by noting that "[w]hile [the] New York [law] presumes that individuals have no public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'" *Id.* at 2148 (internal citations omitted).  Nonetheless, the New York law at issue in *Bruen* and Section 922(n) at issue here are distinguishable in many aspects as explained below.

///

15

In determining whether Section 922(n) and surety laws are "relevantly similar" the Supreme Court directed courts to consider "at least two metrics: how and why the regulation burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133.  As to the "how" question, Section 922(n) like surety laws presume that the individuals have the right to bear arms.  *Id*. at 2148 (noting that "New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry"); *See also Kay*, 2022 WL 3718519, at*4 (stating that "[l]ike the surety statutes, Section 922(n) is faithful to the notion that individuals have a right to bear arms").  The surety laws only applied to a subset of persons who had disturbed the peace or who were determined by an officer of the peace to be likely to spread fear among the people.  Likewise, Section 922(n) applies to a subset of persons, individuals under felony indictment, whom a grand jury indicted upon a finding of probable cause or "its prosecutorial equivalent in the context of a consented-to felony information" that they have committed a serious crime.  *See Rowson*, 2023 WL 431037, at *23.  Also, Section 922(n) is arguably less burdensome in firearm regulation than surety laws.  Surety laws placed a complete ban on individual's possession of firearms if they were unable to post surety.  Section 922(n), on the other hand, does not prohibit felony indictees from continued possession and/or public carry of firearms; it just prohibits an indictee from shipping, receiving, or transferring firearms during their indictment process.  *See* 18 U.S.C. 922(n); *See also Rowson*, 2023 WL 431037, at*23    ("Unlike the surety laws, which deprived citizens of the right to possess firearms, § 922(n) does not disturb the indictee's right to continued possession of a firearm"); *Kays*, 2022 WL 3718519, at *5 (noting surety laws required a showing of special need or posting a bond before carrying while Section 922(n) does not prohibit an individual from public carrying).

As to the "why" question, taking into consideration the origin of the surety laws, it can be concluded that surety laws were partially intended for public safety.  *See Bruen*, 142 S. Ct. at 2145 (noting three surety laws adopted during the late-18th century and early-19th century which "prohibited bearing arms in a way that spreads 'fear' or 'terror' *among the people*") (emphasis added); *Rowson*, 2023 WL 431037, at *22 (noting that surety laws "derived from a longstanding English tradition of authorizing government agents to seize arms from persons who had acted

unlawfully or in a manner that *threatened the public*") (emphasis added). Thus, surety laws were in place for public safety and were "intended merely for prevention . . .[of] some crime [] intended or likely to happen." *Rahimi*, 2023 WL 1459240, at* 9. Likewise, Section 922(n) is intended to prevent crime because the period during the indictment process is "a volatile period during which the stakes and stress of pending criminal charges often motivate defendants to do violence to themselves or others" raising a reasonable inference of threat to the public. *Kays*, 2022 WL 3718519, at *4 (quoting *United States v. Khatib*, No. 12-CR-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012)) ("It is not unreasonable to infer malevolent intent when an indictee finds it necessary to obtain a firearm during the narrow period during which an indictment is pending. . ."); *See also Laurent*, 861 F. Supp. at 102 ("[I]f the individual only received a gun after indictment, this conduct raises the suspicion that his purpose is not self-defense in the home, but further crime"); *See Rowson*, 2023 WL 431037, at *23 (discussing the same); *Hicks*, 2023 WL 164170, at *7 ("Much like § 922(n), Massachusetts' surety laws addressed the societal fear that those accused—like those under indictment—would 'make an unlawful use of [their firearm]'") (footnote omitted).

The post-*Bruen* courts that have refused to find surety laws as a sufficiently analogous to Section 922(n) have reasoned that since surety laws had procedural safeguards such as payment of a bond or a showing of self-defense, these laws imposed a "qualitatively different burden" on Second Amendment rights. *See Stambaugh*, 2023 WL 16936043, at *5 ("[A] person accused under surety laws could post a bond and continue to carry their firearm in public" and in contrast, Section 922(n) provides no self-defense exception"); *Quiroz*, 2022 WL 4352482, at *8 (discounting surety laws because they included exceptions for self-defense or posting of a bond something that Section 922(n) lacks); *Hicks*, 2023 WL 164170, at *7 (same); *Holden*, 2022 WL 17103509, at *4 (same). However, Section 922(n) "embeds its own mechanism for relief: resolution of the pending indictment (whether by dismissal, plea, acquittal, or conviction)." *Rowson*, 2023 WL 431037, at *24.

Additionally, the court in *Rowson* noted that the "self-defense" exception in some statutes *Quiroz*, *Stambaugh*, *Holden*, and *Hicks* relied on, developed after the Nation's founding. *Id*. The first law appeared in 1836 in Massachusetts and provided:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

*Id*. (quoting Mass Rev. Stat., ch. 134, § 16); *See also Bruen*, 142 S. Ct. at 2148 (quoting same and distinguishing 1795 statute) (footnote omitted).  Between 1838 and 1871, nine other jurisdictions adopted similar laws.  *See Bruen*, 142 S. Ct. at 2148.  As *Bruen* instructs, the best way to undertake a historical analysis is by understanding the scope the Second Amendment had when it was adopted in 1791.  *Id*. at 2133.  Thus, the surety laws then in place only required a justice of the peace to decide whether the accused's Second Amendment rights were to be restricted; they had no "self-defense" exception.  Accordingly, although Section 922(n) may not be a "dead ringer for historical precursors," this Court finds that it is sufficiently analogous to pass constitutional muster.  *Id*.

For the reasons explained above, Defendant's as applied and facial challenges to 18 U.S.C. § 922(n) are denied.

**C.  Defendant knowingly made false statements or representations with respect to information required to be kept by a federally licensed firearm dealer.**

Counts 2 and 3 of the Indictment charge Defendant with violating Section 924(a)(1)(A) which states that "whoever . . . knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter . . . shall be fined under this title, imprisoned not more than five years, or both."  (ECF No. 11 at 2-3); *See* 18 U.S.C. § 924(a)(1)(A).  To establish a violation of Section 924(a)(1)(A), the government need not prove that the false statement or representation to a federally licensed firearm dealer was material.  *United States v. Johnson*, 680 F.3d 1140, 1146 (9th Cir. 2012).  Instead, the government only needs to prove that the defendant knowingly made a false statement with respect to information required to be kept by a federally licensed firearm dealer.  *Id*.

Title 18 U.S.C. § 922(b)(5) requires that federally licensed firearm dealers maintain records containing the "name, age and place of residence" of all individual buyers, pursuant to Section 923

18

"of this chapter."  Section 923(g)(1)(A) states that a federally licensed dealer "shall maintain such records of . . . receipt, sale, or other disposition of firearms at his place of business for such periods, and in such form, as the Attorney General may by regulation prescribe."  18 U.S.C. § 923(g)(1)(A). The relevant Attorney General's promulgated regulations state that:

> Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; the transferee's country of citizenship; the transferee's INS–issued alien number or admission number; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.

27 C.F.R. § 478.124.

Defendant, for the first time in his reply, argued that the specific question to which he answered "no" in the ATF Form 4473 on June 5, 2019, and again on September 18, 2019, — "[a]re you under indictment or information in any court for a felony, or any other crime for which the judge could imprison you for more than one year?"— "is quite clear not 'information required . . . to be kept in the records of a [federally licensed firearms dealer]' under 18 U.C.S. § 924(a)(1)(A)" and as such, Counts 2 and 3 should be dismissed as a matter of law.  (ECF No. 100 at 21); *See also United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc) ("The construction or interpretation of a statute is a question of law").  Defendant alleges that the actual information that a federally licensed firearms dealer is required to keep is a "certification by the transferee that the transferee is not prohibited by the Act from . . . receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." (*Id.*) (citing 27 C.F.R. § 478.124(c)(1)).

///

The Court disagrees with Defendant's reading of the relevant statutes. The Supreme Court noted that including in "this chapter"—Chapter 44 of Title 18—is Section 923(g)(1). In that section, the dealer is required to "maintain such records of . . . sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulation prescribe." *Abramski v. United States*, 573 U.S. 169, 192 (2014) (citing 18 U.S.C. § 923(g)(1)(A)). Those regulations mandate that the federally licensed dealer "retain . . . *as part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms*." *Id.* (emphasis added) (quoting 27 C.F.R. § 478.124(b)). Thus, a false answer on that form—Form 4473—pertains to information a dealer is statutorily required to maintain. *Id.*

Here, Defendant was arraigned on December 19, 2018, on a related case charge for firearm trafficking and was advised of the maximum penalties for the offense, which included a term of imprisonment greater than one year. (ECF No. 1 at ¶ 10.) A few months after Defendant was arraigned, despite having been advised of the maximum penalties for firearm trafficking, he still answered "no," on two different occasions, on the ATF Form 4473 when asked "[a]re you under indictment or information in any court for a felony, or any other crime for which the judge could imprison you for more than one year?" (*See* ECF Nos. 1, 11.) Additionally, in the ATF Form 4473, just above Defendant's signatures, the form states as follows: "I understand that a person who answers 'yes' to any of the questions 11.b through 11.i and/or 12.b through 12.c. *is prohibited from purchasing or receiving a firearm*." (ECF No. 100-1 at Ex. A-2, Ex. B-2) (emphasis added). The specific question to which Defendant answered "no" in both transactions is question 11.b. (*Id.* at Ex. A-1, Ex B-1.) Further, Defendant signed both forms, certifying that he understood and certifying that his answers were true and correct. (*Id.* at Ex. A-2, Ex. B-2.) Accordingly, by answering falsely to question 11.b. on the ATF Form 4473, which is required to be kept in the records of firearm dealers, Defendant made a false statement or representation in violation of 18 U.S.C. § 924(a)(1)(A). *Abramski,* 573 U.S. at 192.

As such, Defendant's motion to dismiss Counts 2 and 3 of the Indictment which charge him with two violations of 18 U.S.C. § 924(a)(1)(A) is denied.

///

20

**IV.**

**Conclusion**

For the reasons explained above, Defendant's motion to dismiss the Indictment is denied.

IT IS SO ORDERED.

Dated:   February 23, 2023

_____
UNITED STATES DISTRICT JUDGE